**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Pollack Landstrom Associates,

Plaintiff,

v.

Civil No. 00-123 (RHK/JMM)
**MEMORANDUM OPINION AND ORDER**

Labtec Corporation,

Defendant.

---

Jeffrey A. Olson and Russell M. Spence, Jr., Spence Olson, P.L.L.C., Minneapolis, Minnesota, for Plaintiff.

Dale M. Wagner and J. Scott Andresen, Bassford, Lockhart, Truesdell & Briggs, P.A., Minneapolis, Minnesota, for Defendant.

---

## Introduction

Plaintiff Pollack Landstrom Associates ("PLA") was the sales representative in four northern states -- including Minnesota -- for computer products manufactured by Defendant Labtec Corporation ("Labtec"). On October 29, 1999, Labtec sent PLA a letter terminating PLA as its sales representative for those four states. On January 21, 2000, Labtec sent a second letter to PLA purporting to amend the October 29, 1999 notice from a termination to a non-renewal. Presently before the Court is Labtec's Motion for Partial Summary Judgment on PLA's claims for defamation and for wrongful termination. For the reasons set forth below, the Court will deny the motion in its entirety.



FILED JAN 0 2 2001
FRANCIS E. DOSAL, CLERK
JUDGMENT ENTD
DEPUTY CLERK

## Background

James Pollack and Darryl Landstrom founded PLA in the early 1980s to be a representative for the manufacturers and marketers of "mass market hard-line products."[1] (Olson Aff. Ex. 1 at 13-14 (Dep. of James Pollack).) Beginning in the mid 1980s, PLA served as a sales representative for Labtec, a marketer of computer speakers, headphones, voice access and/or telephonic products, and other computer products. (Compl. ¶ 3; Answer ¶ 3; Olson Aff. Ex. 1 at 17, 19, 32.) Pursuant to an oral agreement between PLA and Labtec that was not reduced to an executed writing, PLA represented Labtec's products in Minnesota, South Dakota, North Dakota, and Wisconsin (hereinafter "the Northern States").[2] (Compl.¶ 3; Answer ¶ 3; Countercl. ¶ 5; Reply to Countercl. ¶ 4; Nov. 2, 2000 Andresen Aff. (hereinafter "First Andresen Aff.") Ex. B at 2 (Oct. 29, 1999 letter from Russell Weed to James Pollack).) Among the principal accounts to which PLA sold Labtec's products in the Northern States were Best Buy, Musicland, and Target. (Olson Aff. Ex. 1 at 41.)

By October 1, 1999, Labtec had decided to terminate PLA. (Olson Aff. Ex. 2 at

---

[1] "Mass market" products are those designed to be sold to the public. "Hard-line" products are products that do not involve food or textiles; i.e., the products do not include food, pharmaceuticals, clothing, or domestics. (Olson Aff. Ex. 1 at 15 (Dep. of James Pollack).)

[2] Labtec and PLA did have a written sales representative agreement dated April 19, 1996, governing PLA's representation of Labtec in the territory including Missouri, Iowa, Nebraska, Kansas, and Southern Illinois. (Nov. 2, 2000 Andresen Aff. (hereinafter "First Andresen Aff.") Ex. B at 2 (Oct. 29, 1999 letter from Labtec's counsel to PLA).)

88-89 (Dep. of Mark Gurney).) On October 29, 1999, counsel for Labtec sent a letter to PLA stating that Labtec was terminating PLA as its sales representative in the Northern States, effective January 27, 2000.[3] (First Andresen Aff. Ex. B.) Counsel for Labtec asserted that the termination was for good cause in that

> Labtec's anchor customer in the Northern States, Best Buy, has made clear its dissatisfaction with the sales representation of [PLA]. Best Buy's dissatisfaction stems primarily from the lack of strategic representation by [PLA]. Best Buy has communicated that its dissatisfaction is not curable, and that Labtec's relationship with Best Buy will be damaged if Labtec continues to utilize [PLA] as its sales representative.

(Id.) Labtec's counsel asserted that good cause existed for the termination because, "[i]n light of Best Buy's dissatisfaction as described above, [PLA] can no longer be effective on behalf of Labtec with its anchor customer in the Northern States, Best Buy." (Id. at 2.) The termination letter provided that Labtec would continue to pay commissions to PLA for all commissionable sales made in the Northern States prior to the effective date of the termination.[4] (Id.) Labtec's counsel asked, however, that PLA not contact Best Buy or any other Labtec customer regarding Labtec's products during the ninety days prior to the effective date of termination, as "[a]ny such contact will only further materially impair

---

[3] Labtec did not terminate "its Sales Representative Agreement with [PLA], dated April 19, 1996, for the sales territory of Missouri, Iowa, Nebraska, Kansas, and Southern Illinois." (First Andresen Aff. Ex. B at 2.)

[4] Labtec stated that commissions would be calculated based upon (1) a July 1, 1999, Representation Commission letter, and (2) with respect to sales to Best Buy, an e-mail communication dated September 22, 1999. (First Andresen Aff. Ex. B.)

the good will associated with Labtec's trademarks, trade names, logos, and other commercial symbols utilized in the Northern States." (Id.)

Labtec promptly entered into a written consulting agreement with a company called Select Sales. (Olson Aff. Ex. 6 (Consulting Agreement between Labtec and Select Sales, Inc.).) As a consultant, Select Sales was retained to help Labtec bring its products to the marketplace. (Olson Aff. Ex. 2 at 84.) Select Sales assumed that role with respect to Best Buy, Musicland, and Target in the Northern States. (Id.) The Consulting Agreement provided that Select Sales would receive a commission of one percent of net sales during the contract period. (Olson Aff. Ex. 6 at ¶ 1.)

In November 1999, PLA's President, James Pollack, telephoned Best Buy's CEO, Richard Schulze, advising him that PLA had been terminated as Labtec's sales representative as a result of Best Buy's alleged dissatisfaction with PLA.[5] (See Pollack Aff. ¶ 5; Olson Aff. Ex. 1 at 90.) Pollack also forwarded to Schulze and Brad Anderson, Best Buy's President, a copy of the October 29 termination letter. (Olson Aff. Ex. 7 (Nov. 2, 1999 letter from James Pollack to Richard Schulze and Brad Anderson).) Pollack testified that Schulze telephoned Pollack within a couple of weeks, informing Pollack that he had checked into the issue and found no problem with PLA and Best Buy. (Olson Aff. Ex. 1 at 92.) Schulze subsequently sent Pollack a letter stating that

---

[5] Following receipt of the October 29 termination letter from Labtec, James Pollack also talked to persons at Musicland, advising them that PLA had been terminated by Labtec because of a "problem situation" at Best Buy. (Olson Aff. Ex. 1 at 99-100.)

> [a]ll of us at Best Buy appreciate the level of service that you and your firm has [sic] provided to Best Buy over the decades we have done business together. It has always been my view that you have attempted, wherever possible, to assist in the growth and development of our company through the timely representation of new and interesting products, well suited . . . to our channel of distribution.

(Olson Aff. Ex. 5 (Dec. 10, 1999 letter from Richard Schulze to Jim Pollack).) On December 20, 1999, PLA brought suit in state court against Labtec, alleging wrongful termination and defamation.[6] Labtec removed the action to this Court on January 18, 2000.

After Labtec had removed PLA's lawsuit to this Court, and on the same day Labtec filed its answer and asserted a counterclaim for declaratory judgment, Labtec sent a letter to PLA's counsel. (Countercl. ¶ 8; Reply to Countercl. ¶ 7.) This letter stated that, as an "accommodation" to PLA, Labtec would "amend its notice, such that Pollack Landstrom's sales representation will not be renewed, instead of terminated. The effective date of the non-renewal will be April 26, 2000, or 180 days from October 29, 1999." (First Andresen Aff. Ex. C at 2 (Jan. 21, 2000 letter from Labtec to counsel for PLA).) Labtec reiterated that good cause existed for its earlier decision to terminate PLA as its sales representative in the Northern States. That good cause included "the

---

[6] On or about June 14, 2000, PLA brought a second action in state court against Labtec, alleging that Labtec breached its sales representative agreement with PLA by refusing to pay a 4% commission on net sales to Best Buy. Labtec removed that second action to this Court as well and filed an answer. The second action has been consolidated with the first. PLA is not seeking summary judgment with respect to the breach of contract claim asserted in the second action.

dissatisfaction of Best Buy, Labtec's anchor customer in the Northern States, with Pollack Landstrom, and the ineffectiveness of your client's representation on behalf of Labtec in the Northern states." (Id. at 1.)

## Analysis

### I. Standard of Dccision

Summary judgment is proper if, viewing the record in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that the material facts in the case are undisputed. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The court must view the evidence, and the inferences which may be reasonably drawn from it, in the light most favorable to the nonmoving party. See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997).

The nonmoving party may not rest on mere allegations or denials, but rather must demonstrate the existence of specific facts that create a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 2514 (1986); Krenik v. County of Le Sueuer, 47 F.3d 953, 957 (8th Cir. 1995). The court does not weigh facts or evaluate the credibility of affidavits and other evidence on a motion for

summary judgment. See Liberty Lobby, 477 U.S. at 249, 106 S. Ct. at 2511. The nonmovant, however, cannot avoid summary judgment in favor of the movant merely by pointing to some alleged factual dispute between the parties. Instead, any fact alleged to be in dispute must be "outcome determinative under prevailing law," that is, it must be material to an essential element of the specific theory of recovery at issue. See Dancy v. Hyster Co., 127 F.3d 649, 652 (8th Cir. 1997); Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992).

## II. Wrongful Termination of a Sales Representative Agreement

In its motion for summary judgment on the wrongful termination claim, Labtec analyzes its conduct against the standards of Minnesota's Termination of Sales Representatives Act ("TSRA"), Minn. Stat § 325E.37. A sales representative's relationship with a manufacturer may come to an end where either the agreement between the parties has not been renewed or where the agreement has been terminated. Subdivision 3 of § 325E.37 is the non-renewal provision of the TSRA, providing that

> [u]nless the failure to renew a sales representative agreement is for good cause, and the sales representative has failed to correct reasons for termination as required by subdivision 2, no person may fail to renew a sales representative agreement unless the sales representative has been given written notice of the intention not to renew at least 90 days in advance of the expiration of the agreement. For purposes of this subdivision, a sales representative agreement of indefinite duration shall be treated as if it were for a definite duration expiring 180 days after the giving of written notice of intention not to continue the agreement.

Minn. Stat. § 325E.37, subd. 3 (emphasis added). A manufacturer may also terminate a

sales representative agreement, but only for good cause:

> (a) A manufacturer, wholesaler, assembler, or importer may not terminate a sales representative agreement unless the person has good cause and
>
> (1) that person has given written notice setting forth the reasons for the termination at least 90 days in advance of termination; and
>
> (2) the recipient of the notice fails to correct the reasons stated for termination in the notice within 60 days of receipt of the notice.

Minn. Stat. § 325E.37, subd. 2(a).

PLA responds to Labtec's motion by arguing that Labtec did not comply with the TSRA, either with respect to non-renewal or with respect to termination. PLA also argues that Labtec breached the terms of the parties' oral sales representative agreement. Specifically, PLA contends that Labtec had granted PLA a "favored nation" status such that Labtec could only terminate or decline to renew PLA's sales representative agreement "for cause" and only after PLA had been given a "reasonable opportunity" of at least 120 days to cure the problem. Because the "favored nation" status affords PLA greater protection than the TSRA, the Court begins with the alleged "favored nation" agreement.

**A. PLA's Alleged "Favored Nation" Status**

PLA has presented evidence that David Dietz, formerly a senior vice president of sales at Labtec, granted PLA a special "favored nation" status pursuant to which Labtec agreed never to terminate or fail to renew PLA's sales representative relationship except

for cause and only after allowing PLA a period of at least 120 days to cure the problem. (Olson Aff. Ex. 1 at 118-20; Dietz Aff. ¶¶ 7-8.) PLA argues that the October 29 termination was wrongful because Labtec lacked good cause and did not afford PLA an opportunity to correct the alleged problem.

PLA asserts that the parties "had an oral sales representative agreement for successive one year terms which renewed each year on April 1 (the beginning of Labtec's fiscal year)." (Pl.'s Mem. Opp'n Summ. J. at 4 (emphasis added); see also id. at 12.) PLA has acknowledged that Labtec never put the terms of this "favored nation" status into writing, and that PLA never prepared a writing that confirmed those terms. (Olson Aff. Ex. 1 at 119-20.) PLA contends that, if Labtec disputes the existence or scope of PLA's "favored nation" status, a genuine issue of material fact exists that precludes summary judgment.

Under Minnesota law, a party cannot maintain an action based upon an agreement that "by its terms is not to be performed within one year from the making thereof," unless the agreement (or some note or memorandum thereof), expressing the consideration, is in writing and signed by the party to be charged therewith. Minn. Stat. § 513.01(1). "The purpose of the Statute of Frauds is to 'defend against frauds and perjuries by denying force to oral contracts of certain types which are peculiarly adaptable to those purposes.'" In re Guardianship of Huesman, 354 N.W.2d 860, 863 (Minn. Ct. App. 1984) (quoting Alamoe Realty Co. v. Mutual Trust Life Ins. Co., 202 Minn. 457, 459, 278 N.W. 902, 903

(1938)). PLA's "favored nation" argument, the facts surrounding which were not pleaded in its Complaint, clearly calls to mind the evidentiary concerns that the Statute of Frauds seeks to address. Counsel for PLA acknowledged at oral argument that its claim that Labtec terminated the parties' sales representative agreement in violation of PLA's alleged "favored nation" status may be barred by the Statute of Frauds. PLA has offered no evidence to suggest that the obligations that the parties owed each other pursuant to the alleged oral agreement could have been performed "within one year." The Court concludes that any claim for wrongful termination based upon such an oral contract is barred by the Statute of Frauds.

## B. Minnesota's Termination of Sales Representative Statute

### 1. <u>The effective date of Labtec's "notice of non-renewal"</u>

Labtec contends it is entitled to summary judgment on PLA's wrongful termination claim because it gave PLA notice of its "non-renewal" of the parties' agreement pursuant to Minn. Stat.§ 325E.37, subd. 3, 154 days prior to the agreement's alleged expiration date of April 1, 2000.[7] Labtec arrives at a figure of 154 days by assuming that its January 21, 2000, letter to PLA retroactively amended the October 29,

---

[7] For purposes of its motion, Labtec assumes that PLA is correct and the sales representative agreement was renewed for consecutive one year terms ending on March 31. If Labtec is correct that the sales representative agreement was for an indefinite term, then Labtec was required to give PLA 180 days notice of Labtec's intent not to renew the agreement. Neither the October 29, 1999 letter nor the January 21, 2000 letter would satisfy that 180 day notice requirement.

1999 letter from a termination letter into a notice of non-renewal.[8] The only authority Labtec presented in support of its assertion that the January 21 letter can convert the October 29 termination letter nunc pro tunc into a non-renewal notice involves Rule 15(c)(2) of the Federal Rules of Civil Procedure.

Rule 15(c)(2) provides that "an amendment of a pleading relates back to the date of the original pleading when . . . the claim or defense asserted in the amended pleading arose out of the same conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading." Fed. R. Civ. P. 15(c)(2). Labtec acknowledges that neither its "notice of non-renewal" nor its "termination letter" is a "pleading," as defined in the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 7(a) (listing the pleadings allowed in a civil action). Labtec asks the Court to apply the "relation back" principle set out in Rule 15(c) by analogy to the notices it provided to PLA. The Court will not do so. Labtec has provided the Court with no legal authority supporting an application, by analogy, of the relation back doctrine under circumstances such as these. Furthermore, the Court concludes that, even if such precedent existed, it would be inequitable under the circumstances of this case to apply the "relation back" doctrine to the letters at issue here.

---

[8] PLA contends that Labtec's January 21, 2000, letter cannot modify the October 29, 1999, termination letter because, by January 21, the agreement had already been terminated. This argument ignores the plain language in the October 29 letter stating that the termination would be effective on January 27, 2000. (First Andresen Aff. Ex. B.) Thus, the termination was not yet effective as of January 21, 2000, and PLA's argument that the January 21 letter is inoperative because the agreement between the parties no longer existed is unpersuasive.

Labtec's manoeuver to retroactively amend the termination letter was made only after PLA had brought suit for wrongful termination and on the same day Labtec filed its Answer and asserted a counterclaim for declaratory relief.

The Court will not distort the precedent under Rule 15(c)(2) of the Federal Rules of Civil Procedure to permit Labtec to alter the consequences of its conduct after PLA had brought suit due to that conduct. Any argument regarding Labtec's decision not to renew the sales representative agreement with PLA (as opposed to terminating that agreement) must be made using the date stated on the face of the "non-renewal" letter.

**2. The effect of an untimely notice of non-renewal**

Evaluating the "non-renewal" letter based on its date of January 21, 2000, it is evident that Labtec gave PLA seventy days notice of non-renewal, less than the ninety days called for in subdivision 3 of Minn. Stat. § 325E.37. The parties disagree over the legal consequences of Labtec's untimely notice of non-renewal under § 325E.37.

Labtec contends that an untimely notice of non-renewal only impacts the time period during which the sales representative is entitled to receive commissions; Labtec asserts that it does not alter the legal effect of the notice. Labtec further argues that, because it paid PLA commissions for more than 90 days after the January 21 letter, PLA has no damages and therefore cannot maintain its claim. The vast majority of the cases Labtec cites in support of this proposition pre-date the enactment of the TSRA, and do not construe the notice requirements set forth in § 325E.37. The Court concludes that

Labtec's argument is inconsistent with (and would indeed undermine) the plain language of the TSRA.

The Minnesota Legislature structured subdivision 3 of the TSRA, governing non-renewals, around two variables: (1) whether the person has made its non-renewal decision based upon "good cause" or without "good cause"; and (2) whether the sales representative agreement is for a definite term or an indefinite term. Subdivision 3 prohibits any person from failing to renew a sales representative agreement where there is no "good cause" for the failure to renew unless written notice is given at least 90 days before the end of the agreement's term (if it has one) or at least 180 days before the end of the relationship (if the agreement is of indefinite duration). See Minn Stat. § 325E.37, subd. 3. Compliance with subdivision 3's minimum notice requirements is clearly a prerequisite for effectively declining to renew a sales representative agreement without good cause.

In arguing that the January 21, 2000 notice is effective under subdivision 3, Labtec has assumed (through its references to the ninety-day notice requirement) that its decision not to renew the agreement with PLA was made without good cause. If Labtec indeed lacked "good cause" for failing to renew PLA's agreement, then Labtec cannot avoid the plain language of subdivision 3, which requires at least ninety days advance notice of the intent not to renew. Labtec alternatively argues that PLA has not suffered any damages as a result of Labtec's untimely notice because PLA received commissions for over

ninety days. That contention is unavailing for two reasons. First, it has no basis in the TSRA. Subdivision 4 of the TSRA grants a sales representative the right to continue to receive commissions for a certain period of time in cases where the parties' agreement has been terminated. Minn. Stat. § 325E.37, subd. 4. Labtec has characterized its January 21, 2000 notice, however, as one of "non-renewal." Subdivision 4 does not purport to govern the sales representative's rights to receive commissions where the event ending the agreement is "non-renewal."[9]

Second, Labtec's "no-harm, no-foul" argument would completely read the 90- and 180-day notice requirements out of subdivision 3. By Labtec's reasoning, a manufacturer could provide ten days notice, or even two days notice of a decision (without cause) not to renew the sales representative agreement, and that notice would be "effective" so long as the manufacturer paid the sales representative commissions for 90 or 180 days

---

[9] The only case Labtec has cited involving a late notice of non-renewal under Minn. Stat. § 325E.37 is an unpublished decision from the Minnesota Court of Appeals, Ciatti v. Roma Tools & Plastics, No. C5-93-88, 1993 WL 242992 (Minn. Ct. App. July 6, 1993). In Ciatti, the plaintiff argued that Roma Tools had "failed to renew" the parties' contract when it removed him from a particular account, and that Roma Tools lacked good cause for the non-renewal. Ciatti thus claimed that Roma Tools violated § 325E.37, subd. 3, by not giving him a statutorily required notice of non-renewal. See Ciatti, 1993 WL 242992 at * 5. The court of appeals concluded that the premises underlying Ciatti's claim were without merit; nevertheless, it also stated in dicta that, even if Roma Tools had failed to give Ciatti the requisite notice, Ciatti could not establish any damages cognizable at law because Roma Tools had paid commissions to Ciatti for one year. See id. The Ciatti court did not squarely consider whether an untimely notice of non-renewal is even legally effective, it did not evaluate the plain language of the statute, and it reached its conclusion without the support of any authority. This Court does not find the Ciatti opinion persuasive vis-a-vis the issue presented in this case.

(depending on the structure of the agreement). The Court concludes that Labtec cannot, as a matter of law, establish that it effectively gave PLA notice of a "non-renewal" without good cause for the non-renewal, where Labtec has failed to comply with the TSRA's mandatory notice periods.

If it is Labtec's position that it had "good cause" for failing to renew PLA's agreement (as Labtec asserted in both the October 29, 1999 termination letter and the January 21, 2000 non-renewal letter), then Labtec would not be required to comply with the 90- or 180-day notice requirements. Whether Labtec had "good cause" to end its relationship with PLA, however, involves questions of fact. The Court next considers whether there is a genuine issue of material fact regarding the existence of "good cause" for Labtec's action.

### 3. Good cause for ending PLA's sales representative agreement

The TSRA expressly defines the "good cause" that can support the non-renewal or termination of a sales representative agreement:

> "Good cause" means a material breach of one or more provisions of a written sales representative agreement governing the relationship with the manufacturer, wholesaler, assembler, or importer, <u>or in the absence of a written agreement, failure by the sales representative to substantially comply with the material and reasonable requirements imposed by the manufacturer, wholesaler, assembler or importer</u>. Good cause includes, but is not limited to:
>
> 1. the bankruptcy or insolvency of the sales representative;
>
> 2. assignment for the benefit of creditors or similar disposition of the

assets of the sales representative's business;

3. the voluntary abandonment of the business by the sales representative as determined by a totality of the circumstances;

4. conviction or a plea of guilty or no contest to a charge of violating any law relating to the sales representative's business;

5. any act of the sales representative which materially impairs the good will associated with the manufacturer's, wholesaler's, assembler's or importer's trademark, trade name, service mark, logotype, or other commercial symbol; or

6. failure to forward customer payments to the manufacturer, wholesaler, assembler or importer.

Minn. Stat. § 325E.37, subd. 1(b) (emphasis added). Labtec has not argued on summary judgment that any of the six specifically enumerated examples of "good cause" apply to PLA. Presumably, therefore, Labtec has based its assertion of "good cause" to end its relationship with PLA in the Northern States, upon PLA's failure "to substantially comply with the material and reasonable requirements imposed" by Labtec. Id.

The record presently before the Court establishes that there is a genuine issue of material fact as to whether, in 1999, PLA failed to comply substantially with Labtec's material and reasonable requirements. Labtec's alleged "good cause" rests primarily on Best Buy's purported incurable dissatisfaction with PLA's performance as Labtec's sales representative. PLA has come forward with evidence that Best Buy was not dissatisfied with PLA as a sales representative and that Labtec's decision to remove PLA as a sales

representative for the Northern States was in fact driven by a desire to reduce the amount Labtec was paying its sales representatives in commissions.[10] The Court therefore will deny Labtec's motion for summary judgment on PLA's wrongful termination claim.

## III. Defamation

Labtec presents two main arguments in support of its motion for summary judgment on the defamation claim. First, Labtec asserts that PLA cannot establish one or more of the essential elements of the defamation claim. Second, Labtec argues that its statements under the circumstances of this case, were privileged. Labtec places primary emphasis on the privilege argument. Before considering whether a privilege applies, however, the Court will first address the essential elements of the claim, on which PLA has the burden of proof.

"[F]or a statement to be considered defamatory, it must be communicated to

---

[10] In May 1999, Labtec sent a letter to its "Manufacturer Rep Principals" notifying them that, effective July 1, 1999, it would be changing its commission rate for direct retail sales to four percent. (Olson Aff. Ex. 3 (May 26, 1999 letter from Labtec).) Thus, for part of the 1999 calendar year, Labtec paid PLA a four percent commission on the net sales to Best Buy. (Compl. in Civil No. 00-2062 ¶ 5; Answer in Civil No. 00-2062 ¶ 6.) On September 22, 1999, Labtec sent PLA an e-mail letter giving PLA "official notification" that Labtec was reducing its commission rate on net sales to Best Buy to three percent effective October 1, 1999. (Pollack Aff. ¶ 7; Olson Aff. Ex. 4 (Sept. 22, 1999 e-mail from Mark Gurney to James Pollack).) The e-mail stated that the reduction was "due to the increased competitive situation that we are facing at Best Buy and the need to create additional marketing dollars to fend off this situation." (Olson Aff. Ex. 4.) Pollock protested the commission reduction in a telephone call to Mark Gurney. (Olson Aff. Ex. 1 at 111.) Despite Pollack's protests, after October 1, 1999, Labtec paid PLA a three percent commission on the net sales to Best Buy. (Compl. in Civil No. 00-2062 ¶ 6; Answer in Civil No. 00-2062 ¶ 7.)

someone other than the plaintiff, it must be false, and it must tend to harm the plaintiff's reputation and to lower him or her in the estimation of the community." Lewis v. Equitable Life Assurance Soc'y, 389 N.W.2d 876, 886 (Minn. 1986) (citing Stuempges v. Parke, Davis & Co., 297 N.W.2d 252, 255 (Minn. 1980)). Labtec argues that Plaintiff cannot establish the existence of a genuine issue of material fact as to whether (1) the statement that Best Buy was dissatisfied -- indeed, incurably dissatisfied -- with PLA's sales representation, stemming mainly from an alleged lack of strategic representation by PLA, was false, (2) the statement was published to a third party (for example, through compelled self-publication), or (3) the statement tended to harm PLA's reputation. None of these arguments is compelling.

With respect to the falsity of the statement that Labtec terminated PLA because of Best Buy's dissatisfaction with PLA's representation, PLA has come forward with evidence tending to show that (a) Best Buy has had no problem with PLA as a sales representative for other manufacturers, (b) Labtec terminated PLA shortly after PLA protested Labtec's unilateral efforts to cut PLA's commission rate, and (c) Labtec did not adequately investigate any alleged complaints from Best Buy before terminating PLA. Viewing the evidence in the light most favorable to the non-moving party, it appears that a reasonable jury could find that Labtec's stated reason for ending its sales representative relationship with PLA was false.

It further appears that a reasonable jury could find that Labtec's stated reason for

terminating PLA was aimed at PLA's competency and, therefore, impacted its business reputation. "[I]mputations affecting a person's conduct of business, trade, or profession are actionable without proof of special damage. . . . In other words, the remarks must relate to the person in his professional capacity and not merely as an individual without regard to his profession." Anderson v. Kammeier, 262 N.W.2d 366, 372 (Minn. 1978); see also Becker v. Alloy Hardfacing & Eng'g Co., 401 N.W.2d 655, 661(Minn. 1987) ("Among those types of actions which are defamatory per se are false accusations of committing a crime and false statements about a person's business, trade, or professional conduct."). The letters sent to PLA indicated that PLA was unable to provide "strategic representation" for its client and had resulted in the caused incurable dissatisfaction of the client's key customer. Such statements would appear to fall within the scope of the defamation per se described in Anderson and Becker.

As for the publication of the false statement, PLA argues that there is evidence to support a finding that the statement was published by virtue of PLA's compelled self-publication. In adopting a doctrine of "compelled self-publication," the Minnesota Supreme Court held that self-publication

> does no more than hold the originator of the defamatory statement liable for damages caused by the statement where the originator knows, or should know, of circumstances whereby the defamed person has no reasonable means of avoiding publication of the statement or avoiding the resulting damages; in other words, in cases where the defamed person was compelled to publish the statement. In such circumstances, the damages are fairly viewed as the direct result of the originator's actions.

Lewis, 389 N.W.2d at 888. There is evidence in the record that PLA represents other manufacturers' products to Best Buy, Musicland, and Target (the key accounts for Labtec in the Northern States). A reasonable jury could conclude that Labtec should have foreseen that PLA would contact Best Buy to investigate the alleged problems with the Labtec account. Similarly, a reasonable jury could conclude that Labtec should have foreseen that others "in the industry" (e.g., other key accounts in the Northern States like Musicland and Target) would learn of PLA's termination as Labtec's sales representative and ask questions. Thus, viewing the evidence in the light most favorable to PLA, a reasonable jury could find that Labtec knew or should have known that PLA would be unable to avoid repeating the reasons Labtec gave for ending its relationship with PLA and, hence, causing damage to PLA's business reputation.

Labtec has failed to show that there is no genuine issue of material fact regarding the essential elements of a defamation claim. Thus, Labtec is left with its argument that the statement at issue -- Labtec's reasons for terminating its sales representative agreement with PLA -- is privileged. Under Minnesota law, even where an untrue defamatory statement has been published, "the originator of the statement will not be held liable if the statement is published under circumstances that make it conditionally privileged and if privilege is not abused." Lewis, 397 N.W.2d at 889 (citing Restatement (Second) of Torts § 593 (1977)).

> A communication, to be privileged, must be made upon a proper occasion, from a proper motive, and must be based upon reasonable or probable cause. When so made in good faith, the law does not imply malice from the communication itself, as in the ordinary case of libel. Actual malice must be proved, before there can be a recovery, and in the absence of such proof the plaintiff cannot recover.

Stuempges, 297 N.W.2d at 256-57. The Court in Lewis held that the initial determination of whether a communication is privileged is a question of law for the court to decide. Lewis, 389 N.W.2d at 890. Subsequently, Minnesota courts have modified the analysis to recognize that the issue of whether the person uttering the allegedly defamatory statement "had reasonable or probable cause to make the allegedly defamatory statement becomes a question of fact for the jury if the evidence 'permits of more than one conclusion.'" Palmisano v. Allina Health Sys. Inc., 190 F.3d 881, 885 n.2 (8th Cir. 1999).

PLA argues that Labtec failed to conduct a sufficient investigation before making the alleged defamatory statements and, therefore, lacked reasonable or probable cause for the statements. PLA notes that the Affidavit of Mark Gurney, Labtec's Vice President of Sales, is wishy-washy at best: Gurney avers that someone at Best Buy told someone at Labtec that some of Labtec's problems with the Best Buy account "may have been" due to PLA's representation of Labtec, and that Labtec "might" want to consider other representation. (See First Andresen Aff. Ex. D, ¶ 4 (Aff. of Mark Guerney).) To the extent PLA has been able to conduct discovery into the facts referenced in Gurney's affidavit, there appears to be a sufficient basis for a reasonable jury to find that Labtec

had not sufficiently investigated PLA's representation prior to sending the October 29, 1999 termination letter, such that the statements in the letter were not supported by reasonable or probable cause.[11] In light of that disputed factual question, the Court will not resolve whether, as a matter of law, Labtec had a qualified privilege to make its statements regarding PLA's performance as Labtec's sales representative.

PLA alternatively argues that, even if a privilege applies to Labtec's statements regarding why it terminated PLA, the privilege has been lost because Labtec abused it.

> A qualified privilege may be lost if it is abused. The burden is on the plaintiff to show that the privilege has been abused. While the initial determination of whether a communication is privileged is a question of law for the court to decide, the question of whether the privilege was abused is a jury question.

Lewis, 389 N.W.2d at 890. A qualified privilege may be abused if the statements are made with malice. PLA argues that, at a minimum, the evidence gives rise to a genuine issue of material fact as to whether Labtec greatly exaggerated the purported basis for its termination of PLA's sales representative agreement. Among the evidence to support such a finding, PLA points to the fact that Best Buy was not, in fact, dissatisfied with PLA. Thus, PLA contends, Labtec's statement that Best Buy's dissatisfaction was "incurable" was either deliberately false or a great exaggeration. The Court is satisfied that, viewing the evidence in the light most favorable to PLA, a reasonable jury could

---

[11] At the time Labtec's summary judgment motion came on for hearing, PLA had approximately one month of fact discovery remaining, much of which was focused on the basis for Labtec's decision to terminate PLA's representation in the Northern States. (See Olson Aff. ¶¶ 3-9.)

find that Labtec overstepped its bounds and made representations that were unjustifiable. Accordingly, the Court will deny Labtec's motion for summary judgment on PLA's defamation claim.

## Conclusion

Based on the foregoing, and all of the files, records and proceedings herein, **IT IS ORDERED THAT** Defendant Labtec Corporation's Motion for Partial Summary Judgment (Doc. No. 36) is **DENIED**.

Dated: January 2, 2001

RICHARD H. KYLE
United States District Judge